UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ]<br>  ]<br>v. ]<br>  ]<br>GRAYSON SHERRILL ]<br>  ] | Criminal No.  21-CR-282 (010<br><br>Judge Chutkan |

**SENTENCING MEMORANDUM**

Defendant Grayson Sherrill, through undersigned counsel, respectfully submits the following memorandum in support of sentencing.

Mr. Sherrill pled guilty to assaulting, resisting, or impeding law enforcement officers, in violation of 18 USC § 111(a )(1).

Mr Sherrill requests that the factors detailed below be taken into consideration, including the facts that (1) Mr. Sherrill did not cause injury to any person or property; (2) he was only 21 years old at the time of the offense, with a spotless prior criminal record; (3) his lack of extremist background or intent, including nonappearance on social media before or after January 6; (4) his prognosis for the future; and importantly (5) his sincere remorse.  Given these factors, a sentence including home detention and/or halfway house placement is  ". . . sufficient but not greater than necessary"  to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## *I. Considerations in Imposition of Sentence*

The Federal sentencing statute, 18 U.S.C. § 3553(a), requires that this Court impose a sentence that is ". . . sufficient but not greater than necessary" to comply with the purposes of sentencing as set forth in 18 U.S.C. §3553(a).

In United States v. Booker, 543 U.S. 220 (2005), the U.S. Supreme Court held that the U.S. Sentencing Guidelines (USSG) are advisory only - not mandatory. In Rita v. United States, 551 U.S. 338,351 (2007), the Supreme Court further explained that "...the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply." The court can no longer presume that a Guidelines sentence is the appropriate sentence. To do so would be to take a large step in the direction of returning to the pre-Booker regime. United States v. Pickett, 475 F.3d 1347 (D.C. Cir. 2007).

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). Kimbrough v United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing. Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. at 101; Pepper, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted)(citing Rita v. United

States, 551 U.S. 338, 351 (2007)(district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in Kimbrough, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Kimbrough, 552 U.S. at 91, 109-10; see also Spears v. United States, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

The factors under 18 U.S.C. section 3553(a) to be considered in imposing a sentence that is sufficient but not greater than necessary to comply with the purposes of section 3553(a) include:

> (1) the nature and circumstances of the offense ***and the history and characteristics of the defendant***; (emphasis added)
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the advisory guidelines range;
>
> (5) any pertinent policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities; and
>
> (7) the need to provide restitution to any victims of the offense.

## II.  Sentencing Factors under 18 USC § 3553

**A.     *Summary of Factors Compelling a Sentence for Mr. Sherrill.***

Given the factors detailed below, the USSG advisory guideline range is excessive for protection of the community or punishment, and a lesser sentence is appropriate:

- Mr. Sherrill has no history of extremist behavior or ideology, either before or after January 6, 2021, and no social media history;

- Mr. Sherrill did not injure anyone, including the complainant officer - in fact the officer does not remember the incident;

- Mr. Sherrill was charged with and pled guilty to a single incident - in contrast to other defendants, he was not engaged in a protracted altercation, or other altercations with law enforcement, including pushing or shoving;

- Mr. Sherrill fully understands the wrongfulness of his actions on January 6, 2022, and has expressed genuine remorse for his conduct;

- the guidelines are out of step with comparative sentences for his action, particularly when contrasted with the actions of Mr. Sherrill before, during and after January 6;

- the pandemic has greatly impacted Mr. Sherrill's case, and could be expected to continue to impact his incarceration; and

- Mr. Sherrill pled guilty in this case, fully accepting responsibility and sparing the court and public the lengthy trial which would have been required for a trial.

4

### B.     *Mr. Sherrill's history and conduct up to January 6, 2021.*

Mr. Sherrill was not on social media, either before or after January 6. This is in contrast to almost all other charged defendants regarding January 6.

As he has stated, Mr. Sherrill did not come to Washington, DC, intending to be violent or invade the Capitol. Exhibit A. He came to attend former President Trump's rally. He met one codefendant approximately 10 years earlier through their shared interest in an internet video game, and had not previously known the other codefendant.

Mr. Sherrill was born, raised and still lives in the small town of Cherryville, NC, with a 2021 population of a little more than 6,000 people. The textile industry was historically a large employer for the town, although most mills have closed. Mr. Sherrill graduated from the local high school, and followed up with a year of community college. After a year in college, he started to work in a local company to help support his mother. He is still works for a manufacturing company, and resides with his mother.

Mr. Sherrill is from a very supportive family which, like Mr. Sherrill himself, works hard and supports the community. Mr. Sherrill, who was only 21 years old on January 6, was an active and involved member of the community. As a youth he was a proud Boy Scout for a number of years, as shown in the attached photos. Exhibit C, under seal. During his earlier years Mr. Sherrill was also involved in community sports, as shown in attached photos. Exhibit D, under seal. After graduating from high school he worked as a safety officer at his job, and led a safety team. Exhibit E, under seal. This position includes ensuring safety in machine use and protocols. He has also earned workplace safety certificates. Exhibit F, under seal. In addition, he has volunteered to help in the community, cleaning up at the local public lake area. Exhibit G under seal, Exhibit H-15.

Attached are 16 letters of support from people in his community, including Mr. Sherrill's family, who attest to his generosity and thoughtfulness. Exhibit H, 1-21. Their support confirms that his actions on the Capitol grounds were totally out of character, and will not be repeated. A video including statements by his family, a community member and Mr. Sherrell, himself, detail

his background and character. Exhibit M, under seal.

The letters in support are from former educators, family and community members. These persons have witnessed Mr. Sherrill's behavior over decades. They are well aware of the charges, and of Mr. Sherrll's remorse. They are willing to contact the Court, despite the incredibly harsh publicity of this case, because they are confident that Mr. Sherrill will never again engage in the acts which bring him before this Court.

### C.   *January 6 events*

There is no question that Mr. Sherrill's attendance at former President Trump's rally was protected activity, and had he left DC after the rally, he would not be in this position. That was certainly his intention when traveling to the District of Columbia. He was not armed, nor was he wearing protective gear. Instead of leaving the mall from the rally, as he had planned, he followed the crowd to the Capitol. There was a pile of poles on the Capitol grounds, and when offered one, he took it. While on the Capitol grounds he saw Officer DH in a tussle with other persons in an attempt to keep them from approaching the Capitol, and Mr. Sherrill took one swing in the direction of DH, in a completely misguided and illegal action. He knows that what he did was completely wrong. Exhibit A, Exhibit B under seal. The parties agree that DH did not receive any injuries from the incident, and DH does not remember the particular incident, which occurred over no more than a few seconds. Mr. Sherrill saw other melees with law enforcement officers and did not insert himself in any other altercations. He did not try to interfere with any other police officers or force his way through the police into a Capitol entrance.

This was a singular assault for which he sincerely apologizes to the Court and to the Officer. Id.

Mr. Sherrell entered the Capitol through an open and unattended door. He is well aware that there was no excuse for entering the U.S. Capitol, regardless whether the door he entered was open. He understands that his actions on January 6 added to the chaos and disruption, and fully apologies for his actions.

### D.   *Remorse and Rehabilitation*

Mr. Sherrill has clearly and unflinchingly expressed his regret and remorse for his conduct, which is the antitheses of behavior that he has practiced his entire life.  Exhibits A, B, M.

Mr. Sherrill wanted to resolve his case.  The Court set the case for trial despite a defense request for additional time to negotiate with the government. After the trial date was set, the defense was able to provide the government with a professionally prepared video at a slower speed, to show that Mr. Sherrill did not hit DH on his helmet, as originally alleged by the government.  Exhibit J.  The altercation occurred over a matter of a few seconds at most, and involved several persons.  The new evidence led to an amended (reduced) plea offer, which Mr. Sherrill accepted, avoiding the expense and time of trial of the case.

Post-arrest rehabilitation is an important consideration in sentencing under 18 USC § 3553, and can be a basis for variance from the Guidelines.  See  Pepper v. United States, 562 U.S. 476, 504-5 (2011)(under the factors of 18 USC § 3553, post-conviction rehabilitation may support a downward variance from the Sentencing Guidelines range).  In Pepper, supra, the defendant received a downward variance from the U.S. Sentencing Guidelines at his resentencing, due to his extensive rehabilitation efforts after his original sentence.  The U.S. Supreme Court stated that post-conviction rehabilitation may be a basis for downward departure, based on its analysis of the sentencing factors under section 3553.  The Court stated that a defendant's rehabilitation can be an important factor in sentencing under section 3553 in a number of ways: For example, evidence of rehabilitation:

> "...may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) --in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); see McMannus, 496 F.3d, at 853 (Melloy, J., concurring) ("In assessing . . . deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"). Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under §

> 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2)."
>
> Pepper, supra, at 491.

Mr. Sherrill has used the time since his arrest to look at and refocus his life. Like many persons, he became unfocused during the pandemic, and has now established future goals, including career goals.

As noted in the letters of support, as well as the art samples provided to the Court (Exhibit K under seal), Mr. Sherrill is a talented artist. He acknowledges that after finishing high school he became unfocused, and his arrest forced him to make priorities and think about what he wants to do as a career. He is proud of his safety work, but also wants to use his art talent. He has been refinishing his garage to use as a workshop for art projects, and hopes to eventually work full time as an artist. Exhibit L under seal.

### E.    *The Sentencing Guidelines* Overstate Mr. Sherrill's Actions

#### 1.    Sentences under 18 USC § 111(a)

The United States Sentencing Guidelines (USSG) level for Mr. Sherrill's plea of guilty is 21, with a criminal history level I (zero criminal history points), for a Guidelines range of 37 to 46 months incarceration.

Significantly, the draft presentence report states that for persons in Mr. Sherrill's criminal offense and history category, after excluding those who did not receive a sentence of incarceration in whole or in part, the MEDIAN sentence received was 37 months incarceration. Doc 120, Presentence Report, paragraph 100. This means that a substantial number of sentences were BELOW the Guidelines range. Indeed, the Judiciary Sentencing Information states that almost half - 42 per cent - of the defendants received sentences BELOW the Guidelines range. Clearly, Judges find the Guidelines excessive for this category of assault.

Courts have also reduced sentences based on a defendant's youth at the time of prior convictions. See, e.g. United States v. Naylor, 259 F. Supp. 2d 521, 524-25 (W.D. Va

2005)(sentencing the defendant based on the non-career-offender guideline range, even though he met the designation based on offenses that he committed before he turned eighteen, based on the "history and characteristics of the defendant" Cited with approval in United States v. Crocco, 15 F.4th 20, 26 (1st Cir. 2021).

At the time of the two offenses charged above, Mr. Sherrill was only 21 years old - easily within the range of a youthful offender act, were this still available in Federal Court. Mr. Sherrill has no arrests, much less convictions or periods of incarceration prior to this case. Since his arrest more than two years ago, he has had a chance to reflect on the seriousness of the offense, as well as the impact on the community, his family, and himself. It is clear to anyone who meets Mr. Sherrill, and as reflected in his letters of support, that he is an introverted, quiet and sensitive young man. During the past two years he has reflected on his actions, fully complied with his conditions of release, and shown that he is not a danger to the community.

Here, there is a compelling case for reduction of his sentence due to overstatement of the offense in the Guidelines, Mr. Sherrill's youth, and his absence of prior convictions. A review of the factors in 18 USC § 3553 makes clear that the Guidelines level does not fairly reflect his particular case.

2. <u>Comparative sentences in January 6 cases</u>.

While each case is unique, most cases involving section 111(a) involve lengthy or multiple interactions with officers, and/or injury to officers. Mr. Sherrill's case involves none of these.

In addition, most cases involving January 6 defendants - for any count of conviction - involve social media contact before January 6 showing preparations for illegal activity - through extremist ideology, and/or physical preparation such as wearing protective gear and/or masks. Again, Mr. Sherrill did neither. He did not wear any military type gear, and was never masked the

entire time he was on the Capitol grounds and inside the Capitol.[1]  And most cases show social media contact after January 6 condoning the invasion of the Capitol.  In contrast, Mr. Sherrill was not on social media.

In contrast to many cases - even for those charged with misdemeanors - It is undisputed that Mr. Sherrill never led the crowd to enter the Capitol, or injured anyone.  In that way, his conduct is more aligned with persons sentenced under 18 USC § 231(a)(3).  And Mr. Sherrill's behavior was less significant than other persons sentenced under section 231.

In United States v. Moises Romero, case no. 2021-CR-677(TSC), the defendant and others pushed against a temporary barrier which officers were holding to keep civilians out of the Capitol.  Romero wore a respirator to the Capitol, and held up signs to rally the crowd.  The crowd, including Romero, eventually succeeded in pushing though the barriers, into the defending officers, and entering into the Capitol.  When an officer tried to use a riot shield to push the civilians back, Romero grabbed the shield, and further braced against the wall to push against the officers.  The group, with Romero's help, was eventually able to break the police line and force itself into the building, breeching the entryway.  After spending time inside the Capitol, Romero left, only to encourage persons to break into a different Capitol entrance which officers were trying to keep closed.  The actions of Romero were not only dangerous to multiple officers, but directly led to the breech of an entry to the U.S. Capitol.  Romero subsequently posted videos lauding his actions. This Court sentenced Romero to 11 months incarceration.  Mr. Sherrill's action was not injurious, and unlike Romero, he did not rally others to force one - much less  multiple - openings for persons to enter the Capitol.

---

[1]  Mr. Sherrill told that government that he had a Faraday bag for his phone.  While he acknowledges that he objects to any organization, including the government, snooping into the lives and locations of private citizens, he actually used the phone inside the Capitol, which defeats any government argument that he had the bag to prevent the government from locating future illegal activities.

F. *The Impact of the Coronavirus Pandemic on Mr. Sherrill's Case*

Due to the coronarius pandemic, Mr. Sherrill's meetings with his counsel and the Court were severely restricted, hindering his representation.

In addition, while the Bureau of Prisons has gone through several phases to modify restrictions on inmates, COVID-19 has not been eliminated by any stretch of the imagination. Prisons are still subject to restrictions on housing, visiting and educational opportunities depending on the status of infection at a given facility. Mr. Sherrill is subject to the stress of illness in prison, as well as potentially restricted family visits and educational opportunities.

The effect of prison quarantines on enrollment in prison programs, and subsequent negative impact on early release, is undisputed. Any restrictions on educational opportunities in prison due to quarantines could affect his release date.

The Sentencing Commission's recent data does not accurately acknowledge the impact COVID-19 has had on sentences. Reportedly, federal judges have given downward variances in 2.5% of cases based on COVID-19; however, the Commission data includes cases 6 months before the pandemic, spanning from October 2019 to September 2020.[2] While the Commission has made no recommendations on adjusting sentences based on the harshness of serving time during the pandemic, many Federal judges have addressed the impact COVID-19 has on those serving a sentence. One Federal judge has explained:

> Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And **I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years**. That's what I believe in terms of how punitive it's been and how harsh it's been.

---

[2] Brian Jacobs, The U.S. Sentencing Commission's Inadequate Response To Covid-19, Forbes.com, Sept. 17, 2021, https://www.forbes.com/sites/insider/2021/09/17/the-us-sentencing-commissions-inadequate-response-to-covid-19/?sh=64d4dab27ee8

>Sentencing Tr. at 17-18, <u>United States v. Gonzalez</u>, Case No. 1:18-cr-00669-JPO, ECF No. 250 (S.D.N.Y. April 2, 2021) (emphasis added).

### G. *Deterrence*

One factor to be considered in sentencing under Section 3553 is deterrence. But deterrence is only one factor - it does not override all other sentencing considerations. There are 2 types of deterrence. The first is personal deterrence - is a sentence of incarceration necessary to deter the defendant from repeating the offense? Given his behavior before the offense, and while under court supervision, It cannot be seriously argued that there is any reason to think that Mr. Sherrill would repeat this offense.

The second type of deterrence is general deterrence - will the sentence deter others from committing these acts? The government wants this factor to swallow all other considerations. More than 1000 people have been arrested for their January 6 activities, and as of March 8, more than 400 have been sentenced.[3] The government correctly states that the events of January 6 were unique, but this is not a reason for an excessive and irrational emphasis on general deterrence in sentencing. The riot was a response to another unique event - encouragement and incitement by the President of the United States. There is no serious question that hundreds of people would not have gone to the Capitol but for the exhortations of the President. During his January 6 speech he even claimed, among many other comments in his speech, "We won in a landslide. This was a landslide. They said it's not American to challenge the election. This the most corrupt election in the history, maybe of the world." He exhorted the crowd, "We fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore." And he told them, "We're going to walk down Pennsylvania Ave."[4]

---

[3] https://time.com/6133336/jan-6-capitol-riot-arrests-sentences/

[4] Trump's entire speech of approximately 1 hour 15 minutes is available in video format and transcript at this link: https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial

For this event to recur, a future president would have to contest the election, stage a rally for the same day as the electoral college vote, and exhort people to go to the Capitol during the vote. The only future president for whom anyone could conceive of that happening is Donald Trump. But if Donald Trump is re-elected, he has made it clear that he will pardon those convicted of January 6 offenses.[5]

In addition, it appears that Trump supporters have lost interest in protesting to support his claims. Despite similar exhortations to protest Trump's criminal arraignment in New York,[6] the spectacle was quite small by New York (or any) standards.[7] Regardless the reason, Mr. Trump's words no longer instill rioting. Mr. Sherrill's sentence should not ignore this reality.

And Mr. Sherrill's sentence must consider his unique combination of factors which compel a sentence which is far below the Guidelines, and rather is in relation to the few seconds during which the felony occurred, as well as Mr. Sherrill's background and subsequent remorse in this case.

### H.   Just Punishment

Mr. Sherrill requests a sentence including home detention or halfway house placement. There is a Federal halfway house in Charlotte, NC, which would allow him to continue to work and contribute to society, rather than be a drain on society in prison. Mr. Sherrill is in very formative years when other young men are going to school, progressing in the work force, establishing long term relationships, and starting families. While his peers are in the community attaining these vital life skills and maturity, the government asks that Mr. Sherrill be incarcerated - for years. This would be both his first incarceration and a very lengthy incarceration. It is far greater than necessary to accomplish the goals of sentencing as stated in 18 USC § 3553.

---

[5] https://www.washingtonpost.com/national-security/2022/09/01/trump-jan-6-rioters-pardon/

[6] https://abc7ny.com/trump-protests-new-york-indictment-nypd-security/13084639/

[7] https://www.pbs.org/newshour/politics/trumps-expected-surrender-and-arraignment-creates-new-york-spectacle

### *III. Conclusion*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007) citing Koon v. United States, 518 U.S. 81, 113 (1996).

Given Mr. Sherrill's, exceptional rehabilitation, youth, overstatement of the offense in the Guidelines, criminal history, complete acceptance of responsibility, increased punitive impact of the pandemic, and unique circumstances of the case  - which Mr. Sherrill has zero intention of repeating, a sentence of home detention or halfway house placement is indicated in this case to protect the public, afford just punishment, and provide for rehabilitation.

Respectfully submitted,

_____/s/_____

Joanne D. Slaight, #332866
400  7th Street, N.W.,  Suite 206
Washington, DC  20004
Phone (202) 256-8969
Email:  jslaight@att.net