# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-00282 (TSC)** |
| **GRAYSON SHERRILL** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Grayson Sherrill to 41 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment. This recommendation falls in the middle of the calculated sentencing guideline range of 37 to 46 months.

## I.    INTRODUCTION

The defendant, Grayson Sherrill, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On February 3, 2023, Sherill pled guilty to one count of violating 18 U.S.C. § 111(a)(1), assaulting, resisting, or impeding law enforcement officers. After attending the "Stop the Steal" rally, Sherrill made his way to the Capitol grounds where he spent numerous hours. He started on the West front. As a unit of officers tried to make their way through the crowd to provide much needed reinforcements to protect the Capitol building, a mob of rioters swarmed and assaulted the officers. As one rioter physically charged at an officer, Sherrill took advantage of that officer's vulnerability. Sherrill violently swung and struck the officer with a metal pole. Sherrill then made his way into the Capitol building – still wielding the metal pole – less than ten minutes after the initial breach of the building when chaos was at an all-time high. He roamed the Capitol building for 34 minutes, banged on a door with his metal pole, joined a mob of rioters that overtook a police line in the Crypt, chanted "NANCY! NANCY!" as he approached House Speaker Nancy Pelosi's office, climbed on statues in the Rotunda, watched as rioters forced open doors and fought with officers, and took videos of the chaos around him. After he left the building, Sherrill climbed on a government vehicle and watched the continued chaos as officers tried to reclaim the Capitol building. Sherrill remained on Capitol grounds until evening. After January 6, Sherrill deleted videos from his cell phone that he took at the Capitol on January 6.

The government recommends that the Court sentence Sherill to 41 months' incarceration for his conviction of violating 18 U.S.C. § 111(a)(1), which is in the middle of the advisory Guidelines' range of 37 to 46 months.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

ECF No. 104, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.     Sherrill's Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Grayson Sherrill travelled by car with co-defendants Elliot Bishai and Elias Irizarry from South Carolina to Washington, D.C. to attend the "Stop the Steal" rally. After attending the former president's rally but before the end of his speech, Sherrill, Irizarry, and Bishai marched towards the West side of the Capitol. As they approached the building, they saw downed bike rack barricades and broken fencing from the restricted perimeter. Sherrill and Irizarry picked up metal poles that were broken off from the bike rack barricades. According to Sherrill, he grabbed it as a souvenir. Sherrill carried this metal pole for the rest of the day.



***Figure 1: Sherrill holding the metal pole that he carried with him throughout his time on Capitol grounds***

3

When Sherrill reached the Lower West Terrace, he joined the mob chanting "STOP THE STEAL!" while facing a line of vastly outnumbered officers.



*Figure 2: Sherrill (yellow circle) chanting "Stop the Steal!" with other rioters (Ex 1 at :01)*

A Metropolitan Police Department ("MPD") Civil Disturbance Unit ("CDU") tried to make their way through the crowd to provide much needed reinforcement to United States Capitol Police ("USCP") officers protecting the Capitol building. The CDU marched in a two-by-two formation towards the Capitol building, identifying themselves as police and ordering rioters to move aside. As the officers approached the area where Sherrill stood, members of the mob swarmed the officers and quickly began harassing and insulting the officers. For example, a rioter standing near Sherrill screamed into a bullhorn "FUCKING OATHBREAKERS!"

As rioters continued to aggressively question the officers' authority and patriotism, hurling profanity and abuse, the interactions quickly turned physical. The crowd grew so dense that officers had to fall back one-by-one, holding onto each other by putting their arms on each other's shoulders. Rioters responded by attacking the officers, pushing into them, trying to wrestle away their batons and weapons, throwing large objects at them, and assaulting them with various

weapons and their bodies. Sherrill stood ready, facing officers with his metal pole in hand.



*Figures 3 & 4: Screenshots of bodyworn camera footage showing Sherrill (yellow circle) wielding a metal pole and facing officers moments before he struck an officer with the pole (Ex 2 at 1:55)*

One officer became particularly vulnerable when he was separated from the CDU line. When the officer was standing away from his unit, Sherrill took advantage of the situation; just as another rioter charged his body toward the officer, Sherrill raised his metal pole and violently swung it at the officer, striking the officer. The officer attempted to catch his balance after being attacked on multiple fronts.





***Figures 5, 6, & 7: Screenshots of open source footage showing Sherrill (yellow arrow)
swinging metal pole at and striking officer (blue arrow), top photos, and officer attempting to
regain his footing, bottom photo (Ex. 1 at :11-:13)***

The officer sustained several blows to the head and body on January 6. He reported several
injuries, including suffering from headaches for weeks. This officer was the victim of many attacks
on January 6 and does not know when he sustained specific injuries, nor does he remember the
specific strike from Sherrill.

In addition to witnessing – and participating in – violence against officers while on the
West front, Sherrill saw and smelled tear gas, heard flash bangs, observed other rioters throwing
items at police officers, and observed lines of police officers trying to block rioters from
approaching and entering the building. Despite all these signs that he should leave, he continued
toward the Capitol building.

Sherrill made his way through the crowd where he stood not far behind the line of bike
rack barricades and officers. Sherrill wielded his pole in the air as rioters chanted "USA!"



***Figure 8: Screenshot of open-source footage showing Sherrill (yellow circle)
thrusting his metal pole in the air as rioters chanted "USA!"
and confronted police officers at the front of the line (Ex. 3 at :06-:22)***

Sherrill climbed through scaffolding and ascended stairs to the Upper West Terrace.



***Figure 9: Open source footage showing Sherrill (yellow circle) climbing stairs under the
scaffolding to reach the Upper West Terrace***

When Sherrill reached the Upper West Terrace, he walked toward the Senate Wing Door

just as rioters started to flood into the recently broken windows and door. Sherrill stopped to take

a video of the chaos. He noticed police officers guarding a different door to his left.



*Figure 10: Screenshot of open source video showing Sherrill (yellow circle) taking a video of the Senate Wing Door breach, with police officers guarding the door to his left (blue circle)*

Still carrying the metal pole, Sherrill entered the Capitol building through the Senate Wing

Door at 2:19 p.m. His entry was approximately six minutes after the initial breach.



*Figure 11: Screenshot of CCV footage showing Sherrill (yellow circle) entering as the Capitol building, metal pole in hand (Ex. 5 at :12)*

Once inside the Capitol building, as Sherrill walked by a closed office door, he used his metal pole to bang on the door.



***Figure 12: Screenshot of CCV footage showing Sherrill (yellow circle)
banging on a door with his metal pole (Ex. 5 at :27)***

Sherrill made his way to the Crypt where officers held a line preventing rioters from progressing farther into the building. Rioters chanted "WHOSE HOUSE? OUR HOUSE!" and "STOP THE STEAL!" Sherrill joined the chants and brandished his metal pole in the air as he faced a line of vastly outnumbered police officers.



***Figure 13: Screenshot of open source footage showing Sherrill (yellow circle) brandishing his
metal pole as rioters faced a line of officers (Ex. 7 at 2:00)***

As rioters continued to amass in the Crypt, they overtook the police line. Sherrill marched up a staircase and walked toward House Speaker Nancy Pelosi's office. Rioters, Sherrill included, chanted, "NANCY! NANCY!" Although Speaker Pelosi had been safely evacuated, members of her staff had not, and were cowering in fear for hours while sheltering in their office. *See, e.g.*, https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/ (visited on April 24, 2023).



***Figures 14 & 15: Screenshots of open source video showing Sherrill (yellow circle) marching up the stairs and chanting "NANCY! NANCY!" as he and other rioters approached Nancy Pelosi's office (Ex. 6 at 1:34-1:43)***

Sherrill entered the Rotunda where he reunited with his co-defendants. Both Sherrill and Irizarry still carried metal poles as they roamed the Rotunda.



***Figure 16: Screenshot of open source footage showing Sherrill (yellow circle) marching through the Rotunda, metal pole in hand***

Sherrill made his way to another room near the "Rotunda Doors" where a group of rioters congregated to push doors open that police officers had re-secured. Sherrill saw other rioters fighting with officers in the hallway. He did not leave the building. Instead, Sherrill went back to the Rotunda where he and his co-defendants took several pictures of themselves climbing on statues.



***Figure 17: Photograph of Sherrill (yellow arrow) posing on a statue in the Rotunda, metal pole in hand***

Sherrill continued to march through smoke-filled halls with sirens blaring and chaos around

him. He stayed in the building for 34 minutes.

On his way out of the Capitol building, Sherrill heard that a woman had been shot inside the Capitol. He saw blood on the stairs as he left the building and believed it to be from the woman who was shot. As he left the building, he observed rioters fighting with officers and other rioters attempting to break a window. Even so, for more than an hour and a half, Sherrill remained outside the building, joining chants on the East steps where officers attempted to gain control of the area, marching through the East plaza, and sitting on government vehicles parked outside the Capitol building.





***Figures 18 & 19: Sherrill (yellow circle) remaining on the Capitol steps, top, and sitting on a government car with his metal pole across in hand, bottom***

Sherrill did not leave the Capitol grounds until after dusk.



***Figure 20: Sherrill (yellow arrow) and co-defendants
leaving Capitol grounds in the evening***

After leaving the Capitol grounds, Sherrill rode home with his co-defendants. Co-defendants Irizarry and Bishai participated in debriefings with the FBI after January 6. Both co-defendants separately stated that, on the drive home from the Capitol, Sherrill bragged about

hitting an officer with his metal pole. Bishai specifically attested that Sherrill bragged about hitting the officer "in the helmet." Sherrill kept the metal pole.

### Interview with the FBI

The FBI interviewed Sherrill on March 4, 2021 after he was arrested. Sherrill stated that he came to Washington D.C. for the rally on January 6, because he saw the former president's tweet about the rally. Sherrill admitted to purchasing a Faraday bag prior to January 6 and using the bag on January 6 because he believed the bag would block the government from obtaining his location. Sherrill admitting to deleting videos that he recorded on January 6, 2021.

## III.   THE CHARGES AND PLEA AGREEMENT

On December 15, 2021 a federal grand jury returned a superseding indictment charging Sherrill with eight counts, including 18 U.S.C. § 111(a)(1). On February 3, 2023, Sherrill was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.   STATUTORY PENALTIES

Sherrill now faces sentencing for one count of assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111(a)(1). As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines range, which mirrors the Guidelines stipulations in the plea agreement. PSR at ¶¶ 36-46; Plea agreement at ¶ 5(A).

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| | Adjusted Offense Level | 24 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 49. Accordingly, based on the government's calculation of the defendant's total adjusted offense level after acceptance of responsibility, at 21, Sherrill's Guidelines range is 37 to 46 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sherrill's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The cross reference applies here because Sherill committed a felonious assault with a dangerous weapon with intent to cause bodily injury. *See* § 2A2.2 App. n1 ("Aggravated Assault").

States into a Constitutional crisis.

Sherrill joined the mob for many hours. After he armed himself with a metal pole, Sherrill watched as rioters violently assaulted officers who were trying to make their way through the crowd. He then vigorously joined in those assaults. When one officer was particularly vulnerable because he was under attack by another rioter, Sherrill struck the officer with the metal pole.

Sherrill then climbed through scaffolding and up the stairs to reach the Upper West Terrace where he watched as rioters broke through the Senate Wing door and adjoining windows. After reaching those doors, Sherrill entered the Capitol building despite the sirens blaring, chemical irritant filling the air, and broken glass shattered on the floor. Sherrill banged on a closed door with his pole and then joined a mob of rioters inside the Crypt standing off with a line of officers.

The mob quickly pushed passed the officer line and continued forward. Sherrill continued to roam the halls of the building despite every sign indicating that he should leave. Sherrill joined rioters chanting "NANCY! NANCY!" as her staff members cowered in fear in a conference room. As the rioters approached Speaker Pelosi's office, Sherrill climbed on statues in the Rotunda, watched as rioters pushed open the Rotunda Doors, and stormed through smoke-filled halls.

After leaving the building, Sherrill climbed on government vehicles and watched as chaos ensued. On the ride home from the Capitol, Sherrill bragged to his friends that he hit an officer in the head with a metal pole. The nature and circumstances of Sherrill's offense were of the utmost seriousness, and fully support the government's recommended sentence of 41 months.

**B.  The History and Characteristics of the Defendant**

The defendant is a 24-year old from North Carolina. Sherrill lives with his mother and has a high school education. Sherrill has attended college for several years and is certified in operating

a forklift and in occupational safety management. He currently works as a material handler in Charlotte, North Carolina. Sherrill has no criminal history.

C.   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sherrill's criminal conduct on January 6 was the epitome of disrespect for the law and the epitome of disrespect for law enforcement.

D.   **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence:* A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence:* The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. First, Sherrill's actions on January 6 signify those of a person with little regard for authority. Sherrill joined a mob of rioters in swarming and attacking officers. To dispel any notion that such an action was taken in a spur of thoughtlessness, Sherill later bragged to his friends about hitting the officer in the helmet with a metal pole; he was proud of himself. Second, although Sherrill has accepted responsibility by pleading guilty, he did not admit to his assaultive conduct when he interviewed with the FBI. These facts warrant specific deterrence.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Howard Richardson*, 21-cr-721 (CKK), Jude Kollar-Kotelly sentenced the defendant to 46 months' incarceration based on his guilty plea to violating 18 U.S.C. § 111(a)(1). On January 6, Richardson moved towards the police line on the West Terrace carrying a metal flagpole. As he stood at the front of the line of officers struggling to maintain their position and hold the mob back, Richardson struck an officer three times with the pole. Moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers.

Like Richardson, Sherrill used a metal pole to strike an officer. Richardson swung his metal pole at an officer three times whereas Sherrill swung once. However, Sherrill also decided to climb scaffolding and stairs to enter the Capitol building for 34 minutes despite seeing officers guarding

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

nearby doors and broken glass on the floor and hearing sirens blare. While inside, Sherrill used his metal pole to bang on an office door, joined other rioters in the Crypt and wielded his metal pole in the air as the rioters overtook the police line, joined the ominous chants of "Nancy, Nancy" while her staff members were sheltering in a conference room, filled with anxiety, climbed on statues to take photos wielding the metal pole, watched physical altercations between rioters and officers, and, even after he left the building, climbed on government vehicles and watched as officers continued to fight to reclaim the Capitol. As such, a shorter but comparable sentence is warranted for Sherrill.

Second, in *United States v. Cody Mattice and James Mault*, 21-cr-657 (BAH), the defendants traveled to Washington, D.C. anticipating violence. They packed a backpack with mace, a boot knife, and binoculars. They engaged officers on the front lines of the West Plaza by joining rioters in pulling down a bike fence. Later, they approached the Lower West Terrace Tunnel and sprayed chemical irritant at the officers in the tunnel. Mattice recorded on his cell phone a video of Mault encouraging officers guarding the Capitol to stand aside and let rioters gain access. After January 6, the defendants lied to the FBI about their actions on that day. Judge Howell imposed identical custodial sentences of 44 months of incarceration, after each defendant pled guilty to one count of violating 18 U.S.C. § 111(a)(1).

Unlike Mattice and Mault, Sherrill did not plan for violence ahead of January 6 or, to our knowledge, bring any weapons to the Capitol. However, early in his time on Capitol grounds, Sherrill armed himself with a metal pole that he wielded throughout his time on Capitol grounds and in the building. Sherrill used this metal pole to strike an officer at a time of vulnerability, then bragged about that attack to his codefendants. Like Mattice and Mault, who grabbed at bike racks

on the West Front as rioters tried to force their way to the Capitol building, Sherrill joined a mob

of rioters in the Crypt that grew large enough to overtake the line of police officers, which

permitted rioters to flood farther into the building. Mattice and Mault never made it inside the

Capitol building but Sherrill spent 34 minutes inside, during which he joined the rioters' chants of

"NANCY! NANCY!" Like Mattice and Mault, Sherrill failed to acknowledge his assaultive

conduct to the FBI after his arrest. And although Mattice and Mault discussed their participation

in the January 6 riot after the fact in text messages and by sending videos, Sherrill admitted to

deleting content from his phone, so there is no way to know if he engaged in similar behavior.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Sherrill must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Sherill's played in the riot on January 6.[7] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol on October 14, 2022. *Id.* Sherill's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 96.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 41 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ Ashley Akers
Ashley Akers
MO Bar No. 69609
Trial Attorney
1100 L Street NW
Washington, DC 20005
(202) 353-0521
Ashley.Akers@usdoj.gov

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).